*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

TODD ALLEN AGAR,

        Defendant-Appellant.

UNPUBLISHED
May 08, 2025
2:19 PM

No. 364078
Alpena Circuit Court
LC No. 2020-009509-FC

Before: BORRELLO, P.J., and RIORDAN and PATEL, JJ.

PER CURIAM.

Defendant appeals as of right a judgment of sentence entered following a bench trial. The trial court convicted defendant of one count of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(a) (sexual penetration of a person under 13 years of age). Applying a fourth-offense habitual-offender enhancement under MCL 769.12, the trial court sentenced defendant to 456 to 900 months of imprisonment. For the reasons set forth in this opinion, we affirm defendant's conviction and sentence but remand solely for the ministerial task of correcting the judgment of sentence.

## I. BACKGROUND

Defendant's conviction arose from his abuse of JP. Defendant is related to JP and her mother, and defendant lived with JP's family for extended stretches. The prosecutor presented evidence that defendant sexually abused JP, who is decades younger than defendant, for many years and in many forms, beginning when JP was six years old. However, defendant was only charged with a single count of penile-anal penetration committed against JP when she was under 13 years of age.[1] At trial, JP was 30 years old. She testified that the last incident of sexual abuse

---

[1] Defendant was initially charged with an additional count related to conduct involving JP. However, the trial court granted defendant's pretrial motion to dismiss that additional count for reasons that are not relevant to this appeal. Therefore, only the single count concerning penile-anal penetration is currently being addressed.

by defendant occurred when she was in sixth grade. Defendant faced multiple other charges related to the alleged sexual abuse of two other minor girls, JD and AR, both of whom were also in their early 30s at the time of trial. At the conclusion of trial, the court found defendant guilty of the first-degree criminal sexual conduct (CSC-I) charge regarding JP. However, the court determined that acquittal or a directed verdict in defendant's favor was appropriate for the remaining charges.

In his appeal, defendant asserts that his pre-arrest delay constituted a violation of his due process rights. He claims that the prosecutor failed to comply with the 180-day rule, thereby infringing upon his right to a speedy trial. Defendant further argues that the court should have permitted the introduction of a key prisoner movement document from the Michigan Department of Corrections (MDOC). Alternatively, he contends that his trial attorney demonstrated ineffective assistance by not properly authenticating this document. Additionally, defendant challenges the accuracy of the scoring for Offense Variable (OV) 4 and OV 10 within the sentencing guidelines, asserting that such inaccuracies resulted in a sentence that is both disproportionate and excessively harsh. He also claims that an ex post facto violation occurred in his case and alleges that the prosecutor neglected to disclose exculpatory evidence.

## II. PREARREST DELAY

Defendant argues that his right to due process was compromised due to an excessive delay of more than 13 years by the prosecution in filing charges against him. He claims that this delay has led to the loss of critical evidence, ultimately hindering his ability to mount a robust defense. Specifically, defendant points to recorded interviews conducted by law enforcement in 2015 with two individuals, JD and BC. BC, a friend of JD and another individual named AR, were allegedly present during the incidents of sexual abuse for which defendant was charged. Defendant asserts that these recordings, which capture both JD and BC asserting that no instances of sexual abuse occurred, would have served as exculpatory evidence supporting his case.

"A challenge to a prearrest delay implicates constitutional due process rights, which this Court reviews de novo." *People v Cain*, 238 Mich App 95, 108; 605 NW2d 28 (1999).

"Before dismissal may be granted because of prearrest delay there must be actual and substantial prejudice to the defendant's right to a fair trial and an intent by the prosecution to gain a tactical advantage." *People v Patton*, 285 Mich App 229, 237; 775 NW2d 610 (2009) (quotation marks and citation omitted). "A prearrest delay that causes substantial prejudice to a defendant's right to a fair trial and that was used to gain tactical advantage violates the constitutional right to due process." *People v Woolfolk*, 304 Mich App 450, 454; 848 NW2d 169 (2014), aff'd 497 Mich 23 (2014). "Substantial prejudice is that which meaningfully impairs the defendant's ability to defend against the charge in such a manner that the outcome of the proceedings was likely affected." *Patton*, 285 Mich App at 237. " '[A]ctual and substantial' prejudice requires more than generalized allegations." *Id*. (citation and some quotation marks omitted; alteration in original). To establish a due process violation based on prearrest delay, a defendant has the burden to first come forward with "evidence of prejudice resulting from the delay," after which the prosecution "bears the burden of persuading the court that the reason for the delay was sufficient to justify whatever prejudice results." *Cain*, 238 Mich App at 108-109 (quotation marks and citation omitted). Moreover, as this Court has explained,

"Mere delay between the time of the commission of an offense and arrest is not a denial of due process. There is no constitutional right to be arrested. Rather, the guideline is whether the record presents evidence of prejudice resulting from the delay which violates a defendant's right to procedural due process." [*Patton*, 285 Mich App at 236 (citation omitted).]

Here, the record contains police reports describing the substance of the interviews referenced by defendant. One police report indicates that BC stated in her 2015 police interview that "she was not sexually assaulted by [defendant] and did not witness [defendant] sexually assault [JD] or [AR]." Another police report in the record indicates that JD stated in her 2015 police interview that "she was not sexually assaulted that night by [defendant] and she did not witness [defendant] sexually assault [AR]." According to this same police report, JD further "advised a while back she was in a relationship with [defendant], that relationship did not work out[,]" and that "as much as she despises [defendant], she would not get [defendant] in trouble for something he has not done."

During trial, defendant's counsel conducted a cross-examination of JD regarding statements she made during a police interview in 2015. JD stated that she could not recall the specifics of that interview. In addition, defendant's counsel summoned the police officer who had conducted the 2015 interview to provide testimony. The officer testified that during the interview, JD asserted she had not witnessed defendant sexually assault anyone that night and indicated that she would not falsely accuse defendant, despite expressing a strong dislike for him.

BC was subpoenaed to provide testimony at the trial; however, ultimately did not testify. Defendant's counsel did not offer an explanation for his inability to call BC to the stand. However, it is noteworthy that defendant was acquitted of the charges related to the alleged sexual assaults involving JD and AR, which are most directly associated with the statements made in 2015. In light of these circumstances, defendant has not sufficiently demonstrated that he experienced substantial prejudice or that the delay had a significant adverse impact on his case, or that the delay "meaningfully impair[ed] the defendant's ability to defend against the charge in such a manner that the outcome of the proceedings was likely affected." *Patton*, 285 Mich App at 237; see also *Cain*, 238 Mich App at 108-109. Accordingly, defendant has not shown that his due process rights were violated or that reversal is required.[2] *Woolfolk*, 304 Mich App at 454; *Patton*, 285 Mich App at 236-237.

## III. 180-DAY RULE

Defendant contends that the trial court erred in denying his motion to dismiss on the grounds of an alleged violation of the 180-day rule. He argues that the prosecution failed to

---

[2] In his statement of the question presented, defendant states that "two witnesses died." He fails to develop this argument in the discussion of his prearrest delay. This argument is thus abandoned. *People v Anderson*, 209 Mich App 527, 538; 531 NW2d 780 (1995) (stating that the failure to brief the merits of an argument constitutes abandonment on appeal).

demonstrate a bona fide effort to commence trial within the mandated 180-day period following the notification of his incarceration on separate charges.

"We review for an abuse of discretion a circuit court's decision on a motion to dismiss." *People v Witkoski*, 341 Mich App 54, 59; 988 NW2d 790 (2022). The 180-day rule is defined by statute, and whether this rule was violated presents an issue of statutory interpretation that is reviewed de novo on appeal. *People v Williams*, 475 Mich 245, 250; 716 NW2d 208 (2006).

MCL 780.131(1) provides as follows:

> Whenever the department of corrections receives notice that there is pending in this state any untried warrant, indictment, information, or complaint setting forth against any inmate of a correctional facility of this state a criminal offense for which a prison sentence might be imposed upon conviction, the inmate shall be brought to trial within 180 days after the department of corrections causes to be delivered to the prosecuting attorney of the county in which the warrant, indictment, information, or complaint is pending written notice of the place of imprisonment of the inmate and a request for final disposition of the warrant, indictment, information, or complaint. The request shall be accompanied by a statement setting forth the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time or disciplinary credits earned, the time of parole eligibility of the prisoner, and any decisions of the parole board relating to the prisoner. The written notice and statement shall be delivered by certified mail.

The consequence for violating the statutory 180-day rule is provided in MCL 780.133, which states as follows:

> In the event that, within the time limitation set forth in section 1 of this act, action is not commenced on the matter for which request for disposition was made, no court of this state shall any longer have jurisdiction thereof, nor shall the untried warrant, indictment, information or complaint be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

In *People v Lown*, 488 Mich 242, 272-273; 794 NW2d 9 (2011), our Supreme Court held:

> The statutory 180–day rule, MCL 780.131 and MCL 780.133, may be invoked to require dismissal of a criminal case only if action is not commenced in the case within 180 days after the prosecutor receives the required notice from the DOC. The rule does not deprive the court of its power to hear the case simply because the *trial* has not commenced within that period, let alone because the trial has not been completed. Rather, as this Court has held for more than 50 years, the rule requires the prosecutor to proceed promptly within 180 days to move the case to the point of readiness for trial. As long as the prosecutor does so, dismissal is not required under MCL 780.133 unless, after some preliminary step in the case occurs, that initial action is followed by inexcusable delay beyond the 180–day period and an evident intent not to bring the case to trial promptly. Under such

-4-

circumstances, the court may conclude that action was not in fact meaningfully or genuinely commenced as required by MCL 780.133; put otherwise, the court may conclude that action was not commenced in good faith. But good-faith action should not be viewed as an *exception* to the rule; in this context, the requirement that a prosecutor proceed in "good faith" means simply that he must in fact commence action and cannot satisfy the rule by taking preliminary steps without an ongoing, genuine intent to promptly proceed to trial, as might be evident from subsequent inexcusable delays. Finally, the 180–day period is a fixed period of consecutive days; a court should not calculate the period by allocating only the number of days' delay attributable to the prosecutor, although the reasons underlying specific periods of delay might be otherwise relevant to a court's determination of whether action was in good faith commenced during the requisite period.

Defendant contends that the trial court erred in denying his motion to dismiss based on a violation of the 180-day rule. He argues that the prosecution failed to make a bona fide effort to bring him to trial within the stipulated 180 days after being informed of his incarceration on other charges. The record belies defendant's assertions.

The record reveals that the trial court outlined the impact of the COVID-19 pandemic on court operations, noting that the trial court suspended trial proceedings from March 18, 2020, to October 6, 2020, could not conduct jury trials from November 25, 2020, to February 8, 2021, and faced additional trial restrictions from April 15, 2021, to June 15, 2021. Furthermore, the court documented various delays stemming from defendant's repeated requests to terminate and replace his appointed counsel, numerous requests for trial postponements to facilitate adequate preparation, several pretrial motions filed by the defendant, instances of defendant's disruptive behavior, and the reassignment of the case to a new judge due to the retirement of the previous judge. Additionally, the court recorded pretrial conferences, agreed adjournments, and restrictions related to defendant's quarantine within the Michigan Department of Corrections during the pandemic.

On appeal, defendant does not dispute these factual findings. Instead, his argument posits that the 180-day period lapsed prior to his bindover to the circuit court, claiming that the prosecution took no substantial action to secure his trial from the filing of the complaint until the bindover. He asserts that the prosecution's inaction during this timeframe demonstrates a lack of good faith to promptly bring him to trial, despite the fact that the prosecution-initiated proceedings within the 180-day window. Furthermore, he argues that the trial court erred in attributing responsibility for the delays, leading to the conclusion that the 180-day rule was not breached.

While defendant is correct that the 180-day period constitutes a continuous span of days commencing upon the Michigan Department of Corrections delivering the requisite written notice to the prosecutor, this period should not be calculated solely based on the delays attributable to the prosecutor or the trial court *(Lown*, 488 Mich at 260, 273). Our Supreme Court has made it clear that the reasons behind specific periods of delay may be pertinent to a court's assessment of whether action was initiated in good faith within the necessary timeframe *(Id*. at 273).

In this case, the trial court appears to have conflated its analysis of the 180-day rule with its evaluation of the defendant's distinct speedy trial claim. Nevertheless, the trial court seemed to recognize that the reasons for delay could inform the determination of whether the prosecution acted in good faith during the relevant period. Thus, our reference to the trial court's account of delays and their underlying causes serves as meaningful context for understanding the 180-day rule claim, without implying that responsibility for these delays rests solely with either party.

It is also true that "the requirement that a prosecutor proceed in 'good faith' means simply that he must in fact commence action and cannot satisfy the rule by taking preliminary steps without an ongoing, genuine intent to promptly proceed to trial, as might be evident from subsequent inexcusable delays." *Id*. Defendant in this case seemingly contends that the prosecution did not take *any* action to actually bring defendant to trial within 180 days, implying that the action was not actually commenced in good faith. See *id*. at 272-273.

The record indicates that defendant's preliminary examination was extended to a second day, with additional delays implemented to accommodate defendant's request for subpoenas for specific witnesses to provide testimony. This also allowed the defendant sufficient opportunity to confer with his counsel in preparation for the continuation of the examination. Moreover, within the initial 180-day period post-filing of the complaint and prior to the district court's bindover ruling, the prosecution addressed defendant's motion to dismiss, leading to the trial court convening an evidentiary hearing to adjudicate the motion. During this hearing, defendant sought to relieve his appointed counsel from representation, expressing an intention for his family to engage private counsel. The district court indicated it would assess this request contingent upon the submission of an appearance by new trial counsel.[3] Subsequent to the hearing, the district court rejected the motion to dismiss and ordered the case to proceed to the circuit court. Addressing defendant's motion to dismiss was essential in the pretrial phase, as proceeding to trial without resolving this motion could have raised significant due process issues for defendant. Hence, the prosecution's actions demonstrate a genuine intent to proceed toward trial such that the action was commenced in good faith. *Id*. at 272-273. Defendant has not shown that dismissal was required for violation of the 180-day rule. *Id*. "The statute does not require the action to be commenced so early within the 180-day period as to insure trial or completion of trial within that period. Rather, if apparent good-faith action is taken well within the period and the people proceed promptly and with dispatch thereafter toward readying the case for trial, the condition of the statute for the court's retention of jurisdiction is met." *Witkoski*, 341 Mich App at 60 (quotation marks and citations omitted). "[T]he standard is not whether the prosecutor could have moved faster" or been more diligent. *Id*. at 62, 64. Delays caused by our Supreme Court's response to the circumstances of the COVID-19 pandemic are generally excusable under the 180-day rule. *Id*. at 63.

Defendant concedes that the prosecution undertook various necessary actions throughout the proceedings to prepare for trial, yet contends that these actions indicate the prosecution's lack of readiness for trial. This interpretation reflects a misunderstanding of the standard governing

---

[3]While participating in the hearing via video from prison, defendant ultimately exited the video conference. Consequently, appointed counsel persisted in representing the defendant as the hearing continued.

compliance with the 180-day rule. Furthermore, defendant fails to consider that the prosecution was obligated to address and adjudicate the numerous motions submitted by him during the circuit court proceedings, which are integral to the trial preparation process. Had the prosecution expedited the trial without adjudicating these motions, significant due-process issues would have arisen. Therefore, the defendant has not substantiated any claim that the 180-day rule was violated. *Williams*, 475 Mich at 250.

## IV. SPEEDY TRIAL

Next, defendant asserts that his constitutional right to a speedy trial was violated. He claims that the charges filed against him on October 15, 2019, resulted in a parole hold that precluded his release. The protracted delay of his trial until September 6, 2022, during which he remained in custody, is attributed to actions by the prosecution and the Michigan Department of Corrections (MDOC). Defendant further argues that his own requests for adjournments were necessitated by the MDOC's inability to facilitate his attendance at hearings or meetings with counsel, due to restrictions imposed by the COVID-19 pandemic.

"Whether defendant was denied the right to a speedy trial is a constitutional law question that is reviewed de novo." *People v Rivera*, 301 Mich App 188, 193; 835 NW2d 464 (2013). But any factual findings by the trial court are reviewed for clear error. *People v Waclawski*, 286 Mich App 634, 664; 780 NW2d 321 (2009).

A criminal defendant has a constitutional and statutory right to a "speedy trial without reference to a fixed number of days." *People v McLaughlin*, 258 Mich App 635, 644; 672 NW2d 860 (2003); see also US Const, Am VI; Const 1963, art 1, § 20; MCL 768.1; and MCR 6.004(A). "When a defendant claims a violation of this right, the trial court must consider four factors: (1) the length of the delay, (2) the reasons for the delay, (3) the defendant's assertion of the right, and (4) any prejudice to the defendant." *McLaughlin*, 258 Mich App at 644; see also *Barker v Wingo*, 407 US 514, 530; 92 S Ct 2182; 33 L Ed 2d 101 (1972) (from which the factors are derived).

"The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest," and in "contrast to the 180–day rule, a defendant's right to a speedy trial is not violated after a fixed number of days." *Williams*, 475 Mich at 261. "Following a delay of eighteen months or more, prejudice is presumed, and the burden shifts to the prosecution to show that there was no injury." *Id*. at 262. "[C]ourts may consider which portions of the delay were attributable to each party when determining whether a defendant's speedy trial rights have been violated and may attribute unexplained delays—or inexcusable delays caused by the court— to the prosecution." *Lown*, 488 Mich at 261-262 (citation omitted). "Although delays and docket congestion inherent in the court system are technically attributable to the prosecution, they are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *People v Smith*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 3 (quotation marks and citation omitted).

The parties are in agreement that a delay exceeding eighteen months occurred in this case. Defendant contends that a total of 25 months passed from the initial charge to the filing of his motion to dismiss on the grounds of a speedy trial violation, with an additional three months required for the trial court to address this motion. Conversely, the prosecution asserts that the total

elapsed time from the charge to the commencement of the trial was 35 months. In any event, this delay is considered presumptively prejudicial. *Id*. "[A] presumptively prejudicial delay triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *Id*. (quotation marks and citation omitted).

Regarding the reasons for the delay, defendant was charged on October 15, 2019, while he was already incarcerated for an unrelated conviction. On November 15, 2021, defendant moved in the circuit court for dismissal of the present matter based on the alleged violation of his right to a speedy trial. The circuit court denied this motion on February 14, 2022. Defendant's trial began on September 6, 2022.

In its order denying defendant's motion to dismiss, the circuit court found that defendant was arraigned on October 29, 2019. It noted that delays in the preliminary examination were partially due to defendant's successful request for a change of counsel. Furthermore, the district court addressed multiple motions filed by defendant before transferring the case to the circuit court on April 20, 2020. The court highlighted that the COVID-19 pandemic significantly impacted trial scheduling, noting that trials were suspended from March 18, 2020, to October 6, 2020, and that jury trials could not proceed from November 25, 2020, to February 8, 2021. Additional delays persisted from April 15, 2021, to June 15, 2021. The trial court also enumerated several factors contributing to the delays, including defendant's frequent requests to terminate and replace appointed counsel, multiple motions for trial adjournments for preparation purposes, instances of disruptive behavior, and the reassignment of the case following the retirement of the presiding judge. Moreover, the court considered various pretrial conferences, stipulated adjournments, and defendant's confinement to quarantine within the Michigan Department of Corrections (MDOC) during the pandemic. The trial court determined that the delays were primarily attributable to pandemic-related shutdowns, court scheduling challenges, and actions taken by defendant, attributing minimal delay to the prosecution.

On appeal, defendant does not contest these factual findings but instead argues that the delays were solely the responsibility of the prosecution and the MDOC. He claims that he was compelled to seek adjournments due to the overly restrictive COVID-19 policies enforced by the MDOC, which hindered his ability to attend hearings or consult with his counsel. In doing so, defendant seeks to shift full accountability for the delays onto state actors responding to the pandemic, thereby attempting to absolve himself of responsibility for the delays stemming from his own requests for new counsel and adjournments.

This Court has held "that delays caused by the COVID-19 pandemic are not attributable to the prosecution for purposes of a speedy-trial claim" and that "[u]nlike delays *inherent* in the court system which are attributable to the prosecution, delays resulting from emergency public-health measures during an unprecedented global pandemic are anything but." *Smith*, ___ Mich App at ___; slip op at 5 (citation omitted). This Court further reasoned in *Smith* that "these pandemic-related delays in criminal proceedings across Michigan were neither unexplained nor inexcusable." *Id*. In further support of a conclusion that the extensive pandemic related delays in this case do not somehow fall outside the rule of *Smith*, we note that defendant requested a bench trial on the first day of his trial, which suggests that he was planning on having a jury trial until that time. "To hold a trial amid the pandemic would have required that jurors, witnesses, counsel, and courthouse

personnel act contrary to the advice of public health professionals and put themselves in harm's way." *Id*. (quotation marks and citation omitted).

Defendant does not otherwise contest the trial court's findings regarding the reasons for the delay. Consequently, defendant has failed to show that the reasons for the delay were mostly or primarily attributable to the prosecution. *Lown*, 488 Mich at 261-262. Defendant has not shown that the trial court clearly erred by finding that the delays in this case were primarily attributable to defendant, to "neutral-tint" factors like the change in trial court judges, and to COVID-19 issues that were excusable. See *Williams*, 475 Mich at 263 (reviewing the trial court's findings regarding the responsibility for delay for clear error).

Regarding the prejudice factor, defendant argues that he was prejudiced by the delay because he was denied parole and remained incarcerated due to the charges in this case and did not receive credit for the time he served during the delay because he was on parole. Regarding the effect on his defense at trial, defendant merely makes a general and vague assertion that the "numerous police officers who testified had no memory of what occurred" and the "loss of evidence resulted in an inability to impeach the witnesses." In the context of a speedy trial claim, there "are two types of prejudice which a defendant may experience, that is, prejudice to his person and prejudice to the defense." *Id*. at 264 (quotation marks and citation omitted). "Prejudice to the defense is the more serious concern, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Waclawski*, 286 Mich App at 668 (quotation marks and citation omitted). "Our Supreme Court has repeatedly recognized in the context of lengthy pretrial incarcerations that the most significant concern is whether the defendant's ability to defend himself or herself has been prejudiced." *Id*. at 668-669. Defendant's unsupported and vague assertions of prejudice are insufficient to demonstrate that the trial court's findings were clearly erroneous. *Id*. at 679. So long as the defendant's defense and his ability to obtain a fair trial are not jeopardized, the prejudice factor of the *Barker* test may properly weigh against a defendant subject to a significant period of incarceration akin to that experienced by defendant in this case. *Williams*, 475 Mich at 264-265.

Defendant has failed to show that the trial court erred by denying his motion to dismiss based on his speedy trial claim.

## V. EXCLUSION OF EVIDENCE

Defendant asserts that the trial court erroneously excluded a prisoner-movement log from evidence, claiming that it could have established his incarceration status or parole with a tether during the alleged timeframe of the sexual assault against JP. The trial court ruled the log inadmissible due to insufficient authentication, noting the absence of a certified copy and the lack of a witness from the Michigan Department of Corrections (MDOC) to verify its authenticity. Additionally, the court rejected defendant's motion to restrict cross-examination to only the topics addressed during direct examination if he opted to testify solely on the limited matter of his incarceration dates and parole status. On appeal, defendant contends that based on MRE 901(7), the log qualifies as a public record, which does not necessitate authentication.

Defendant concedes that the issue is unpreserved. See *People v Stimage*, 202 Mich App 28, 30; 507 NW2d 778 (1993) ("An objection based on one ground at trial is insufficient to

preserve an appellate attack based on a different ground."). This Court reviews unpreserved issues for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To obtain appellate relief, the appellant must demonstrate that a clear or obvious error occurred that affected the outcome of the lower court proceedings. *Id*. Even if the appellant makes this showing, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings . . . ." *Id*. at 763-764 (quotation marks, citation, and brackets omitted).

Authentication is a foundational requirement for the admissibility of evidence. See *Mitchell v Kalamazoo Anesthesiology, PC*, 321 Mich App 144, 154-155; 908 NW2d 319 (2017) ("In the role as evidentiary gatekeeper, the trial judge must make the initial determination of whether the evidence is admissible—a question that depends, among other things, on whether the evidence can be authenticated."); *People v Smith*, 336 Mich App 79, 106-107; 969 NW2d 548 (2021) (stating that evidence is authenticated under MRE 901(a) if "the proponent of the evidence has made a prima facie showing that a reasonable juror might conclude that the proffered evidence is what the proponent claims it to be") (quotation marks and citation omitted). The authentication requirement is contained in MRE 901, which stated at the time of trial in relevant part as follows:[4]

> **(a) General Provision.** The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

> **(b) Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

> (1) *Testimony of Witness With Knowledge*. Testimony that a matter is what it is claimed to be.

> \* \* \*

> (7) *Public Records or Reports*. Evidence that a writing authorized by law to be recorded or filed and in fact recorded or filed in a public office, or a purported public record, report, statement, or data compilation, in any form, is from the public office where items of this nature are kept.

However, defendant essentially argues on appeal that the document is self-authenticating because it is a public record. Assuming without deciding that it is a public record, self-authentication is governed by MRE 902, which provided at the time of trial in relevant part as follows:

---

[4] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). We rely on the version of the rules in effect at the time of trial.

Extrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following:

**(1) Domestic Public Documents Under Seal.** A document bearing a seal purporting to be that of the United States, or of any state, district, commonwealth, territory, or insular possession thereof, or the Panama Canal Zone, or the Trust Territory of the Pacific Islands, or of a political subdivision, department, officer, or agency thereof, and a signature purporting to be an attestation or execution.

**(2) Domestic Public Documents Not Under Seal.** A document purporting to bear the signature in the official capacity of an officer or employee of any entity included in paragraph (1) hereof, having no seal, if a public officer having a seal and having official duties in the district or political subdivision of the officer or employee certifies under seal that the signer has the official capacity and that the signature is genuine.

\* \* \*

**(4) Certified Copies of Public Records.** A copy of an official record or report or entry therein, or of a document authorized by law to be recorded or filed and actually recorded or filed in a public office, including data compilations in any form, certified as correct by the custodian or other person authorized to make the certification, by certificate complying with paragraph (1)[ or] (2) . . . or complying with any law of the United States or of this state.

**(5) Official Publications.** Books, pamphlets, or other publications purporting to be issued by public authority.

The plain language of MRE 901 requires evidence supporting authentication of a public record, and MRE 902 provides specific means for self-authentication of a public record. Defendant does not claim that any of the relevant requirements for self-authentication under MRE 902 were satisfied, and he has not provided any legal authority supporting his assertion that a public record may somehow be self-authenticated in another manner. Defendant therefore has not established plain error requiring reversal based on the exclusion from evidence of the prisoner-movement log. *Carines*, 460 Mich at 763-764.

Defendant also contends that his attorney was ineffective for failing to take steps to ensure that the document could be properly authenticated so it could be admitted into evidence, which in turn denied defendant the right to present his alibi defense.

"Whether a defendant has received ineffective assistance of counsel is a mixed question of fact and constitutional law." *People v Yeager*, 511 Mich 478, 487; 999 NW2d 490 (2023). Questions of constitutional law are reviewed de novo, and any factual findings by the trial court are reviewed for clear error. *Id*. However, there was no evidentiary hearing on this issue in the trial court, and our review is therefore limited to the appellate record. *People v Sabin (On Second Remand)*, 242 Mich App 656, 659; 620 NW2d 19 (2000).

To obtain relief on the basis of ineffective assistance of counsel, a party "must show that counsel's performance fell short of [an] objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of [the defendant's trial] would have been different." *People v Ackley*, 497 Mich 381, 389; 870 NW2d 858 (2015) (quotation marks and citation omitted; second alteration in original); see also *Strickland v Washington*, 466 US 668, 690, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ackley*, 497 Mich at 389 (quotation marks and citation omitted).

Even assuming that defense counsel had a duty to authenticate the document, defendant has failed to establish a reasonable probability that the document would have altered the outcome of the trial.*Ackley*, 497 Mich at 389. Defendant asserts that the prisoner movement log would indicate he was incarcerated or on parole in a different jurisdiction on certain dates pertinent to the allegations of sexual assault against JP. This assertion aligns with JP's testimony, which suggests that defendant resided intermittently in her home and was incarcerated during the periods when he was not present. Importantly, however, defendant does not contend that he was continuously incarcerated without any opportunity for access to JP in her residence throughout the potential timeframe of the offenses. Thus, contrary to defendant's claim, this documentation would not establish an "alibi." Furthermore, in cases of criminal sexual conduct involving child victims, the specific timing of the alleged incidents is not considered a critical element or material factor and "an alibi defense does not make time of the essence." *People v Dobek*, 274 Mich App 58, 83; 732 NW2d 546 (2007).[5] Because defendant cannot demonstrate the necessary prejudice, he has not shown that he was denied the effective assistance of counsel. *Ackley*, 497 Mich at 389.

## VI. OV 4 AND OV 10

Next, defendant challenges the scoring of Offense Variable (OV) 4 and OV 10. "Under the sentencing guidelines, a trial court's findings of fact are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Thompson (On Remand)*, 314 Mich App 703, 708; 887 NW2d 650 (2016). Clear error occurs when this Court is left with a firm and definite conviction that an error has taken place. *Id*. This Court reviews de novo whether the facts as found were adequate to satisfy the statutory scoring conditions. *Id*. "When calculating the sentencing guidelines, a court may consider all record evidence, including the contents of a PSIR." *Id*. at 708-709.

---

[5] We recognize that timing is critical, particularly in cases where the offense involves a victim under the age of 13. In such instances, the prosecution is tasked with the burden of demonstrating beyond a reasonable doubt that the criminal acts occurred prior to the victim reaching the age of 13. *Dobek*, 274 Mich App at 84. However, defendant's argument does not pertain to the victim's age. Instead, defendant contends that the proposed exhibit would have demonstrated that he was either incarcerated or on parole during several of the dates on which the alleged sexual assaults against JP occurred.

Defendant first argues that the trial court erred by assessing 10 points for OV 4 because there was insufficient evidence to support a finding that JP suffered serious psychological injury requiring professional treatment.

MCL 777.34(1)(a) states that 10 points are to be assessed for OV 4 if "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(2) states: "Score 10 points if the serious psychological injury may require professional treatment. In making this determination, the fact that treatment has not been sought is not conclusive." A trial court may not assume that someone in the victim's position would suffer serious psychological harm; there must be evidence in support of an injury. *People v Lockett*, 295 Mich App 165, 183; 814 NW2d 295 (2012).

The sentencing transcript reflects that the trial court upheld the scoring of 10 points for OV 4, over defendant's objection, because JP's trial testimony indicated that she had made conscious efforts to avoid thinking about her feelings and memories related to her abuse by defendant. At trial, JP testified that as a child, she knew that what defendant was doing to her was "wrong," but she "compartmentalized" it. JP further testified, "I just put it in the back of my head and I put it in a neat little box and I tried not to think about it." However, JP also explained that "it's something that doesn't go away" and that she "thought about it a lot." Regarding the circumstances of a police interview, JP said:

> I was so ready to not be there and I didn't want to go through with it, and I thought if I said it didn't happen then I wouldn't have to.

* * *

> The advocate lady that they had there kind of looked like a beat down dog when I talked—when I was talking and it just made me want to get out of there even more . . . [b]ecause there's nothing worse than somebody's pity.

The presentence-investigation report (PSIR) narrative, under the heading "Victim's Impact Statement," states: "This writer has not received a [victim's impact statement] from the victim, [JP]. It is noted that during her interview with [a detective], she reported still having nightmares about the assaults and still shakes a lot." Statements in a PSIR and a victim's statement at sentencing can be used to support the scoring of sentencing variables. See *People v Wellman*, 320 Mich App 603, 611; 910 NW2d 304 (2017); *People v Gibbs*, 299 Mich App 473, 493; 830 NW2d 821 (2013); *People v Calloway*, 500 Mich 180, 189; 895 NW2d 165 (2017). At sentencing, JP stated that defendant "shattered [her] soul completely changing the course of [her] life" and added that her "[e]very action [was] tainted with the shadow of trauma [she] endured." She said that defendant "destroyed everything in [her]" and made her "a shell of [a] person" for a long time. Furthermore, JP stated, "[D]efendant changed my life forever. He took my childhood innocence, my sense of worth, self-esteem, and sense of security."

The trial court did not err in its assessment of 10 points for OV 4. JP stated that she tried not to think about the abuse but ended up thinking about it a lot. See *Wellman*, 320 Mich App at 611 (discussing a case that involved psychological injury to the victim's family and wherein the victim's stepfather thought about the crime every day). Years later, during adulthood, JP exhibited

-13-

a strong reluctance to engage in discussions regarding her abusive experiences, even opting to leave the interview room. Importantly, she continued to endure psychological repercussions, including recurrent nightmares and tremors, long after the cessation of the abuse. Evidence in the record demonstrates that the trauma manifested physically as well, with symptoms such as digestive issues reported. Furthermore, the court seemingly accepted the prosecutor's rationale for the score assigned, which notably included observations of JP's demeanor during her testimony— specifically her cowering behavior and attempts to minimize her physical presence. These non-verbal cues were discussed in the context of her testimony, highlighting the severity of her psychological state. JP's statements at sentencing further underscored the conclusion of her significant psychological injury. The defendant's appeal, which draws parallels to the *Lockett* case, lacks merit; the present circumstances are indeed distinct, supported by substantial evidence in the record reflecting a serious psychological injury.

Defendant also argues that the trial court erroneously assigned 15 points for OV 10, which pertains to the exploitation of a vulnerable victim.MCL 777.40(1)(a) provides for a score of 15 points for OV 10 if "[p]redatory conduct was involved." MCL 777.40(3) states, in relevant part:

> (a) "Predatory conduct" means preoffense conduct directed at a victim, or a law enforcement officer posing as a potential victim, for the primary purpose of victimization.

> (b) "Exploit" means to manipulate a victim for selfish or unethical purposes. . . .

> (c) "Vulnerability" means the readily apparent susceptibility of a victim to injury, physical restraint, persuasion, or temptation.

To assess points for OV 10, there must have been "exploitation" of a "vulnerable victim." *People v Cannon*, 481 Mich 152, 157-159; 749 NW2d 257 (2008). Regarding predatory conduct, "preoffense conduct directed at a victim for the primary purpose of victimization inherently involves some level of exploitation." *Id.* at 159. " 'Predatory conduct' under the statute is behavior that precedes the offense, directed at a person for the primary purpose of causing that person to suffer from an injurious action or to be deceived." *Id.* at 161.

In *Cannon*, our Supreme Court set forth the following framework for determining whether 15 points should be assessed for OV 10:

> (1) Did the offender engage in conduct before the commission of the offense?

> (2) Was this conduct directed at one or more specific victims who suffered from a readily apparent susceptibility to injury, physical restraint, persuasion, or temptation?

> (3) Was victimization the offender's primary purpose for engaging in the preoffense conduct?

If the court can answer all these questions affirmatively, then it may properly assess 15 points for OV 10 because the offender engaged in predatory conduct under MCL 777.40. [*Id*. at 162.]

Here, the trial court concluded that 15 points were warranted under OV 10 because defendant exploited JP's very young age and vulnerability to get access to her. The court said that there was "an increase" in behavior akin to "grooming" and that defendant "started off by touching, putting his hands underneath her pants, and touching her vaginal area to see how she would respond and . . . it increased in severity."

No clear error is apparent with regard to the trial court's scoring of OV 10. JP testified at trial that, at her family's apartment in Alpena when she was approximately six years old, she "woke up to [defendant] touching" her underneath her underwear with his fingers, on the outside of her vagina. Defendant "just kept telling [her] that it would feel good; just to let it happen." He also tried to put his penis in her face and told her to "grab a hold of it." JP stated that she tried to yell but defendant put "his hand over [her] mouth." She testified that defendant "masturbated until he got off." JP further indicated that defendant continued to commit similar acts of abuse against her almost every night and that he eventually progressed to forcing her to perform oral sex on him. The family later moved to a different home, and defendant moved there with them. JP said that defendant "continued with the touching and making [her perform] oral [sex] on him" and then progressed to penile-anal penetration. Penile-anal penetration was the basis for the sentencing offense.

The evidence shows that all three prongs of the *Cannon* test were met. Defendant started out with touching JP's intimate areas and trying to put his penis in JP's face. This was prior to the penile-anal penetration that made up the sentencing offense. JP was extremely young, especially in comparison to defendant, who was approximately 20 years older. She was, as a result, susceptible to injury, physical restraint, or persuasion. And it is a reasonable inference that defendant engaged in the preoffense conduct to victimize JP further and engage in escalating sexual assaults. On this record, no scoring error is apparent.

## VII. PROPORTIONALITY OF SENTENCE

Defendant next contends that his sentence was disproportionate because he will be 90 years old before being eligible for parole, making his sentence effectively a "de facto life sentence." "[T]he proper inquiry when reviewing a sentence for reasonableness is whether the trial court abused its discretion by violating the 'principle of proportionality' set forth in *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990), which requires sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017). Appellate "challenges to within-guidelines sentences are reviewed for reasonableness according to the test outlined in *Steanhouse*." *People v Posey*, 512 Mich 317, 326; 1 NW3d 101 (2023) (opinion by BOLDEN, J.).

Here, the trial court stated at sentencing that it was considering the particular facts of the case, defendant's criminal history, the severity of the offense, and the possibility of rehabilitation. But the court said that its primary focus was on the impact on JP. The court stated that JP was "sexually assaulted at a very young age for an extended period of time." The court noted that if it

were to "split" the two ends of the guidelines range (270 and 900 months), the result would be approximately 590 months. It concluded that defendant should be sentenced to 456 to 900 months' imprisonment.

The sentence was within the guidelines range. As stated in *People v Purdle (On Remand)*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 353821); slip op at 5:

> With regard to a within-guidelines sentence, there is a nonbinding presumption of proportionality. And, although a within-guidelines sentence may be disproportionate or unreasonable, the defendant bears the burden of demonstrating that their within-guidelines sentence is unreasonable or disproportionate. [Quotation marks and citations omitted.]

The key focus of the sentencing determination revolves around the seriousness of the matter and the defendant's criminal history. *Id*. at ___; slip op at 5, 7.

In this case, JP was a very young child victimized by a much older relative who lived with her in her family home. Defendant was someone JP should have been able to trust. Instead, he sexually abused her over 100 times and in a variety of ways, including repeated penile-anal penetration. JP threatened to tell someone about the anal rape, but defendant told her that nobody would believe her and threatened to abuse her sister, who was only 3 1/2 years old at the time. JP said that the threats kept her from disclosing the abuse. In addition, defendant became more demanding and aggressive after she threatened to disclose the abuse. Before, he had tried to convince her that the abuse would "feel good," but he subsequently stopped trying to be persuasive and "just did whatever he wanted to do." When he penetrated her vagina with his penis,[6] JP said that it "crushed [her]" because she was raised to be religious and he had taken her virginity. JP's testimony indicated that she suffered serious and long-lasting repercussions from the sexual abuse.

The "circumstances surrounding the offense and the offender" were extremely serious. *Steanhouse*, 500 Mich at 459-460. Defendant has a very extensive criminal history that includes multiple felonies, multiple parole violations, and absconding from parole.

The facts of this case are similar to those in *Purdle*. In that case, this Court stated:

> [The defendant] notes that his current parole eligibility date is November 29, 2077, which means that he will be 89 years old before he is eligible for parole. He contends that his minimum sentence is the equivalent of a death sentence when considered in light of the life expectancy of African American men, both in general and in Michigan prisons. [*Purdle*, ___ Mich App at ___; slip op at 5.]

This Court stated:

> [The defendant] did not, however, receive a death sentence, nor was he sentenced to life in prison. Rather, he received a term of years sentence. The seriousness of

---

[6] This occurred after he had begun the penile-anal penetrations.

his offense is not lessened by [the defendant's] age and race when he was sentenced for murdering [the victim]. Indeed, a defendant's age is insufficient to overcome the presumption of proportionality, especially when considered in light of a defendant's criminal record and the gravity of his offenses.

Here, [the defendant] had a lengthy criminal history. Indeed, he does not dispute that he is a fourth-offense habitual offender, which is a fact that significantly increased his minimum guidelines range under the advisory sentencing guidelines. Moreover, as demonstrated by the properly-admitted other-acts evidence, [the defendant's] action of shooting [the victim] dead following an argument was not the first time that [the defendant] pulled a gun on a woman he was dating in response to an argument. Indeed, a few days earlier, in response to an argument, he frightened another woman he was dating by displaying a gun in response to an argument. Given [the defendant's] history, we conclude that he has demonstrated an unwillingness to obey the law after prior encounters with the criminal justice system and that in light of his recidivism a greater punishment is reasonable. [*Id*. at ___; slip op at 5-6 (quotation marks and citations omitted).]

Like the defendant in *Purdle*, defendant in the present case did not receive a life sentence, and the seriousness of his offense is not lessened by his age at sentencing. Also like the defendant in *Purdle*, defendant has a lengthy criminal history and there was evidence of a history of child sexual abuse from witness JB. He has a history of being unable to conform his behavior to the law. In light of *Purdle*, defendant's arguments on appeal in the present case are unavailing.

This conclusion is further supported by our Supreme Court's holding in *People v Lemons*, 454 Mich 234, 256-259; 562 NW2d 447 (1997), that a sentence of 60 to 90 years was proportionate even though the defendant was 45 years old at time of sentence. The *Lemons* Court stated that "the defendant's sentences were not excessive . . . in light of his age at sentencing where the indeterminate sentences were authorized by the Legislature and were proportionate to the offense and the offender under *Milbourn*." *Id*. at 260. Here, defendant's argument that he improperly received a "de facto" life sentence does not establish that his within-guidelines sentence was disproportionate.

## VIII. EX POST FACTO VIOLATION

Defendant argues in a *in propria persona* brief that the charges against him violate the ex post facto clause, as the Legislature amended the statute of limitations following the offenses against JP to allow for the prosecution of a CSC-I offense at any time. He further claims that his counsel was ineffective for not raising this issue at trial. The defendant acknowledges that plain-error review is applicable in this context. See *Carines*, 460 Mich at 763.

Currently, MCL 767.24(1)(a) authorizes an indictment for CSC-I to be filed at "any time." In *People v Gilliam*, unpublished per curiam opinion of the Court of Appeals, issued February 15, 2024 (Docket No. 364254), p 4, this Court explained some of the history of the statute of limitations for CSC offenses:

[A]fter 1954, the period of limitations for all criminal sexual conduct crimes in Michigan was six years from the date that the offense was committed, pursuant to 1954 PA 100. In 1987, . . . the Legislature passed 1987 PA 255, which became effective on March 30, 1988, and provided "that CSC offenses 'may be found and filed within 6 years after the commission of the offense or by the alleged victim's twenty-first birthday, whichever is later.' " *People v Kasben*, 324 Mich App 1, 4; 919 NW2d 463 (2018), quoting 1987 PA 255. This was the statute of limitations in effect until the Legislature passed 2001 PA 6, which states that CSC-I charges may be brought at any time.

The effective date of 2001 PA 6 was May 2, 2001. Defendant in this case argues that the offense conduct of which he was convicted occurred in 1999 or 2000 and that JP's 21st birthday occurred in June 2013. Thus, defendant contends, prosecution for this offense became time-barred under the version of MCL 767.24 that was in effect in 2000, the latest time at which the offense could have been committed. Defendant further argues that by charging him in 2019 with the present offense of which he was convicted, a violation of the Ex Post Facto Clause of the United States and Michigan Constitutions occurred. See US Const, art I, § 9, cl 3; Const 1963, art 1, § 10.

As in the present case, the defendant in *Gilliam* contended that applying the new statute of limitations for CSC-I to him constituted an ex post facto violation, but the Court ruled as follows:

In *People v Russo*, 439 Mich [584, 593; 487 NW2d 698 (1992)], our Supreme Court addressed a claim regarding the Legislature's 1987 extension of the statute of limitations for sexual assaults in MCL 767.24 by 1987 PA 255 and ruled "that applying the extended statute of limitations to the then-not-yet-time-barred alleged sexual assaults is not ex post facto." For that reason, it was not unconstitutional for the Legislature to amend the statute of limitations "before the defendant had any substantive right to invoke its protection." *Id*.

In this case, as discussed, both charges against [the defendant] for CSC-I were within the period of limitations if filed by AM's twenty-first birthday in 2009, and the Legislature amended MCL 767.24 during that period, in 2001, [by way of] 2001 PA 6. Because the sexual assaults on AM were not already time-barred when the Legislature extended the statute of limitations in 2001, Gilliam would be unsuccessful in a challenge to MCL 767.24 as impermissible ex post facto legislation. MCL 767.24 did not revive a prosecution that was already barred by a statute of limitations, and, therefore, the prosecutor could charge Gilliam as she did, on January 28, 2021. [*Gilliam*, unpub op at 5.]

*Russo* applies to the present case, and we view the unpublished *Gilliam* opinion as persuasive. *Cox v Hartman*, 322 Mich App 292, 307; 911 NW2d 219 (2017) ("Although . . . unpublished opinions are not binding under the rule of stare decisis, a court may nonetheless consider such opinions for their instructive or persuasive value.").

Even accepting defendant's assertion that the offense for which he was convicted occurred before the year 2000, the Legislature extended the limitations period in 2001, at which time, by

-18-

defendant's *own admission*, a prosecution for the sexual abuse against JP was not yet time-barred. Because this sexual assault was not already time-barred when the relevant statute of limitations was extended by the Legislature in 2001, and the amendment thus did not revive a prosecution that was already barred by the statute of limitations, defendant has not demonstrated that it constituted impermissible ex post facto legislation as applied to him. *Gilliam*, unpub op at 5. Consequently, defendant also cannot establish that his trial counsel was ineffective for not raising this issue because "failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 205; 793 NW2d 120 (2010).

## IX. SUPPRESSION OF EVIDENCE

Also in a brief filed *in propria persona*, defendant alleges that a violation of *Brady v Maryland*, 373 US 83; 83 S Ct 1194, 10 L Ed 2d 215 (1963), occurred because the prosecutor suppressed various forms of allegedly exculpatory evidence. In general, a *Brady* issue is a question of law reviewed de novo. *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016).

A *Brady* violation occurs when "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *People v Chenault*, 495 Mich 142, 150; 845 NW2d 731 (2014). "Evidence is favorable to the defense when it is either exculpatory or impeaching," and it is irrelevant whether the prosecutor acted in good faith. *Id*. at 150. "To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," and a " 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id*. (citation and some quotation marks omitted).

Here, defendant first complains that a "Bill of Particulars" and a police report for "Incident No. 10-001530" were suppressed. However, the lower court record appears to contain both of these documents in filings that were made by defendant before trial. Defendant filed a motion for a bill of particulars in the district court, and defendant does not explain on appeal how his own motion can constitute material evidence that could be suppressed by the prosecution to support a *Brady* claim. The police report referenced by defendant was attached as an exhibit to a motion to dismiss that he filed several months before trial. Defendant also does not cogently explain how this report constitutes suppressed evidence. Therefore, these arguments are abandoned. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position. The appellant himself must first adequately prime the pump; only then does the appellate well begin to flow." *Waclawski*, 286 Mich App at 679.

Moreover, the pertinent question regarding materiality when analyzing an alleged *Brady* violation is "whether, in the absence of the suppressed evidence, the defendant received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Chenault*, 495 Mich 142, 150-151 (quotation marks and citation omitted). The essential underlying premise of a *Brady* claim is "the discovery, after trial, of information which had been known to the prosecution but [was] *unknown* to the defense." *Id*. at 153 (quotation marks and citation omitted). Here, defendant has not explained how this evidence was "suppressed" in violation of *Brady* when he actually

possessed the evidence well in advance of trial. *Id*. Defendant has failed to show that he did not receive a fair trial or that the verdict is not worthy of confidence based on his complaints regarding the bill of particulars and police report referenced above, which the record reflects he already possessed well before trial. *Chenault*, 495 Mich 142, 150-151.

Defendant lastly contends that "[f]orensic protocall [sic] interviews were suppressed from five witnesses." Defendant does not further elaborate and utterly fails to develop this argument. This Court will not be made to guess at what defendant is trying to argue. *Waclawski*, 286 Mich App at 679.

## X. JUDGMENT OF SENTENCE

We finally observe a discrepancy in the sentencing judgment regarding the statutory citation associated with the defendant's conviction. The defendant was convicted under MCL 750.520b(1)(a) (pertaining to the penetration of a victim under the age of 13). Consequently, we are remanding the case for the ministerial purpose of amending the judgment of sentence to accurately reflect the correct statutory reference.

Affirmed but remanded solely for the ministerial task of correcting the judgment of sentence. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Michael J. Riordan
/s/ Sima G. Patel